IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
JEFFERSON CITY DIVISION

| | | |
|---|---|---|
| SEMCO, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:11-cv-04026-FJG |
| | ) | |
| HUNTAIR, INC., | ) | |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |
| | ) | |
| | ) | |
| | ) | |

**HUNTAIR'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ..................................................................................................................1

II.  HUNTAIR'S CLAIM CONSTRUCTION PROPOSALS SHOULD BE
     ADOPTED ...........................................................................................................................1
     A.   system for controlling / method of controlling ............................................................1
     B.   controlled space ...........................................................................................................4
     C.   supply air stream..........................................................................................................5
     D.   exhaust air stream ........................................................................................................7
     E.   cooler, and related terms..............................................................................................8
     F.   desiccant / desiccant-based........................................................................................10
     G.   dehumidification wheel .............................................................................................11
     H.   dry and cool zone / moist and warm zone / warm and dry zone / cool
          and moist zone ...........................................................................................................11
     I.   Other terms not argued by SEMCO............................................................................13
          1.   air supplier.........................................................................................................13
          2.   air exhauster ......................................................................................................13
          3.   total energy recovery device / total energy recovery wheel............................14
          4.   passive................................................................................................................14
          5.   cooling/dehumidification mode ........................................................................15

III. CONCLUSION .................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Eaton Corp. v. Rockwell Int'l Corp.*,
 323 F.3d 1332 (Fed. Cir. 2003)......................................................................................2

*In re Paulson*,
 30 F.3d 1475 (Fed. Cir. 2004)........................................................................................2

*Laitram Corp. v. Rexnord, Inc.*,
 939 F.2d 1533 (Fed. Cir. 1991)......................................................................................3

*SRI Int'l v. Matsushita Elec. Corp.*,
 775 F.2d 1107 (Fed. Cir. 1985)......................................................................................3

**STATUTES**

35 U.S.C. § 112, ¶ 6.............................................................................................................9

## I. INTRODUCTION

For many of the claim terms in dispute, SEMCO has not urged any claim construction. For the claim terms where SEMCO has urged a construction, SEMCO seeks to expand the scope of the claims beyond what the '388 patent describes and enables. SEMCO's proposed constructions are unsupported by the intrinsic evidence and incongruous with the language of the asserted claims. SEMCO's attempt to rely on claim differentiation is also unavailing, as is SEMCO's attempt to inject Huntair's accused system into the claim construction exercise. The issue of infringement is irrelevant to claim construction, and the Court should decline SEMCO's invitation to commit legal error by commingling the issues of claim construction and infringement.

In contrast to SEMCO's proposed constructions, Huntair's proposed constructions are faithful to the intrinsic evidence and should be adopted.

## II. HUNTAIR'S CLAIM CONSTRUCTION PROPOSALS SHOULD BE ADOPTED

### A. "system for controlling" (claims 1-15, 18-19, 25, 28-29) / "method of controlling" (claims 37, 44-47, 49)

| HUNTAIR'S PROPOSED CLAIM CONSTRUCTION | SEMCO'S PROPOSED CLAIM CONSTRUCTION |
|---|---|
| "system for controlling" should be construed as used in the patent to mean *a system with controls for adjusting operating parameters to control* | No construction is required. Terms are construed to have their ordinary and customary meaning to one of ordinary skill in the art within the context of the Fischer Patent. |
| "method of controlling" should be construed as used in the patent to mean *a method utilizing controls to adjust operating parameters to control* | No construction is required. The terms of Claim 37 [1] if previously construed in Claim 1 or in Claim 36 shall have the same meaning in Claim 37 and such other terms not previously construed shall have their ordinary and customary meaning to one of ordinary skill in the art within the context of the Fischer Patent. |

1

The preambles of the asserted claims should be construed as limitations of the claims. The preambles provide necessary antecedent basis for the claims, and this fact alone is sufficient to establish the preamble as a limitation. *See, e.g.*, *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention."). For example, in claim 1 the preamble claims "***a*** controlled space," and the body claims "an air supplier adapted to supply air to ***the*** controlled space" and "an air exhauster adapted to exhaust air out of ***the*** controlled space." ('388 patent, claim 1). Similarly, the preambles of the remaining asserted independent claims provide antecedent basis for the body of the claims. (*See* '388 patent, claims 37, 44).

Furthermore, as supported by the same authority SEMCO cites in its Opening Claim Construction Brief (SEMCO Br.[1] at 8, 12), the preambles of SEMCO's asserted independent claims are claim limitations because they are necessary to "breathe life and meaning into the claims." *In re Paulson*, 30 F.3d 1475, 1479 (Fed. Cir. 2004). The asserted independent claims do not merely state a field of invention or purpose, as SEMCO asserts. (SEMCO Br. at 12). Instead, "a system for controlling the temperature and humidity level of a controlled space" and "a method of controlling the temperature and humidity of a controlled space" are necessary limitations to understanding, and providing structure for, the alleged invention claimed in the '388 patent. Without controls and adjustable operating parameters, the claimed system would not achieve ***control*** of temperature and humidity of a ***controlled*** space as claimed. The elements claimed in the body of the asserted claims would merely operate at maximum cooling and drying capacity continuously to, for example, chill and dehumidify air further and further, without

---

[1] D.I. 54.

taking into consideration the conditions of the controlled space, outside conditions, or any desired target temperature and humidity levels for the comfort and health of the occupants of the controlled space. Such a construction would subvert the entire purpose of the '388 patent, which is directed to controlling temperature and humidity by "modulating" operating parameters to "respond to changing loads" both inside and outside. (*See, e.g.*, '388 patent, 16:8-15).

SEMCO's attempt to rely on claim differentiation does not salvage its proposed constructions. "Claim differentiation is a guide, not a rigid rule." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991) (*quoting Autogiro Co. of Am. v. U.S.*, 384 F.2d 391, 404 (Ct. Cl. 1967)). Whether certain dependent claims of the '388 patent claim some limited controls for adjusting operating parameters is beside the point. Claim differentiation cannot be used to overcome the plain language of the asserted independent claims, which require adjustable parameters to achieve "control" of the "controlled space." SEMCO argues that the claims of a patent cannot be construed to have similar meanings, but that is not the law. Many patent claims are similar in scope and have similar meanings, and the doctrine of claim differentiation cannot be used as a crutch to argue against sensible claim constructions that flow directly from the clear language of the claims. SEMCO attempts to elevate form over substance by touting the doctrine of claim differentiation over the language of the claims and the intrinsic evidence.

SEMCO also attempts to cast Huntair's constructions as being motivated by non-infringement arguments, (SEMCO Br. at 16-17), but that is nonsensical. SEMCO has not asserted any claims of the '388 patent claiming adjustable rotational speed dehumidification wheels in this case, and even if it had, whether or not a claim is infringed is irrelevant to the claim construction calculus. *See SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985).

3

### B. "controlled space" (all asserted claims)

| HUNTAIR'S PROPOSED CLAIM CONSTRUCTION | SEMCO'S PROPOSED CLAIM CONSTRUCTION |
|---|---|
| should be construed as used in the patent to mean *an enclosed space* | No construction is required. Terms are construed to have their ordinary and customary meaning to one of ordinary skill in the art within the context of the Fischer Patent. |

SEMCO argues that "controlled space" should not be construed as a claim limitation because the term is set forth in the preamble. (SEMCO Br. at 13). However, not only is the term "controlled space" in the preamble necessary to breathe life into the claims, but the term also provides the antecedent basis for the term used in the body of the claims. Accordingly, the preamble must be construed as limiting.

SEMCO argues that the "controlled space" is the space that "will have its temperature and/or humidity ***affected***." (SEMCO Br. at 12) (emphasis added). But SEMCO's construction ignores the relevant intrinsic evidence. ***Affecting*** temperature and humidity within the controlled space is not enough; according to the plain language of the patent claims, the temperature and humidity of the controlled space must be ***controlled***. As Huntair noted in its Opening Claim Construction Brief (Huntair Br.[2] at 9-10), it is difficult to imagine how one might implement the invention claimed to ***control*** a space that is not enclosed. Therefore "controlled space" should be construed as an "enclosed space."

For the same reason, SEMCO's argument that "controlled space" be construed to mean "any space in which temperature and humidity control is ***desired***" must also fail. (SEMCO Br. at 13) (emphasis added). The plain language of the patent claims requires a "controlled space" that ***is*** controlled, not one where control is ***desired***.

---

[2] D.I. 52.

4

Case 2:11-cv-04026-FJG   Document 65   Filed 09/26/11   Page 7 of 20

Lastly, SEMCO's argument that an enclosed space would not have any inlets or outlets to permit air flow into or out of the enclosed space is nonsensical and contradicts the plain language of the patent that states that the controlled space is "typically . . . an enclosed structure." ('388 patent, 9:14-17). Additionally, Huntair explained in its Opening Brief that its proposed construction of enclosed space could include a substantially enclosed space. (Huntair Br. at 10, n.6).

C.     "supply air stream" (all asserted claims)

| HUNTAIR'S PROPOSED CLAIM CONSTRUCTION | SEMCO'S PROPOSED CLAIM CONSTRUCTION |
|---|---|
| should be construed as used in the patent to mean *a stream of air supplied to the controlled space* | The term "supply air stream" would be understood by one of ordinary skill in the art in the context of the Fischer Patent to mean "any stream of air from any source that is supplied to the system", and is supplied to the controlled space. |

SEMCO's proposed construction of "supply air stream" and its arguments concerning the arrows marked **10***a*, **10***b*, **10***c*, and **10***d* in Figures 3A-3E of the '388 patent contradict the patent specification. SEMCO argues that only arrow **10***d* depicts a stream of air supplied to the controlled space, and that Huntair's proposed construction would limit the definition of supply air stream to only the stream represented by arrow **10***d*. However, the patent specification refers to arrow **10** as the supply air stream, created by "an air supplier **18** adapted to supply air to a controlled space '**9**,'" and Figure 3A labels each of the four streams **10***a***,** **10***b***,** **10***c***,** and **10***d***,** as <u>*also*</u> just **10**, the supply air stream. (*See* '388 patent, Figure 3A; 8:20-40). These are the same air stream.

5



FIG. 3A

Thus, contrary to SEMCO's arguments, Huntair's proposed construction of "supply air stream" as the "stream of air supplied to the controlled space" is supported by Figures 3A-3E and the patent specification because all four streams, **10***a***, 10***b***, 10***c*,** and **10***d*, are being supplied to the controlled space and are called the "supply air stream."

SEMCO's proposed construction is not supported by the patent specification. Under SEMCO's construction of "supply air stream" as "air . . . supplied to the system," **10***d* could not be the supply air stream because it is supplied to the controlled space and not the "system." SEMCO's proposed construction contradicts the intrinsic evidence because the '388 patent describes **10***d* as the supply air stream. (*See, e.g.*, '388 patent, 11:58-60 ("supply air **10***d* being delivered to the controlled space '**9**'"); 13:54-62 ("the supply air stream leaving the cooler (**10***d* of FIG. 3A)"); 17:8-11 ("Supply air **10***d* enters the controlled space"); 18:26-30 ("After passing through the dehumidification wheel **16**, the supply air **10***d* is warmed . . . and further dehumidified . . . , where the air is supplied to the controlled space '**9**'"). Furthermore,

6

SEMCO's labeling of **10***d* as the "Supply Air Stream" (SEMCO Br., Ex. 2) lends further support to Huntair's construction, and not SEMCO's.

Huntair's proposed construction is consistent with the '388 patent, which refers to all four arrows **10***a*, **10***b*, **10***c*, and **10***d* as the supply air stream. The common feature of each stream, including **10***d*, is that each is supplied to the controlled space. However, **10***d* is not supplied to the "system." Therefore SEMCO's construction requiring the supply air stream, and all four **10***a*, **10***b*, **10***c*, and **10***d* arrows, be supplied to the "system" conflicts with the specification of the '388 patent. Furthermore, it is entirely unclear what the "system" is that SEMCO refers to in its construction.

SEMCO's proposed construction is also flawed because, as discussed below, "exhaust air stream" is defined by the plain language of the patent claims as air that is exhausted *__from the controlled space__*. Therefore, "supply air stream," correspondingly, must refer to air supplied *__to the controlled space__*, not the "system."

### D. "exhaust air stream" (all asserted claims)

| HUNTAIR'S PROPOSED CLAIM CONSTRUCTION | SEMCO'S PROPOSED CLAIM CONSTRUCTION |
|---|---|
| should be construed as used in the patent to mean *a stream of air comprising air exhausted from the controlled space* | The term "exhaust air stream" would be understood by one of ordinary skill in the art in the context of the Fischer Patent to mean air drawn from the controlled space or from a variety of other sources. |

SEMCO's proposed construction flatly contradicts the plain language of the asserted patent claims and must be rejected. For example, claims 37 and 44 state that the claimed methods include the step of "exhausting air from the controlled space, creating . . . an exhaust air stream." ('388 patent, 25:9-11, 57-59). Claim 1 recites "an air exhauster adapted to exhaust air

7

out of the controlled space, creating an exhaust air stream." (*Id.* at 20:45-47). Therefore the exhaust air stream must be construed as comprising air exhausted from the controlled space, as it is unambiguously defined by the claims.

SEMCO's proposed construction must also be rejected because it is overly broad and insolubly ambiguous. SEMCO argues that "exhaust air stream" should be construed as meaning "air drawn from the controlled space *__or from a variety of other sources__*." However SEMCO's proposed construction could conceivably cover air from anywhere, even the supply air stream – which cannot be correct.

SEMCO repeats its erroneous argument regarding the arrows in Figures 3A-3E of the '388 patent, this time focusing on arrows **20***a*, **20***b*, **20***c*, and **20***d*. However, again Figure 3A refers to all four arrows **20***a*, **20***b*, **20***c*, and **20***d* as __*also*__ just **20**, the exhaust air stream. (*See* '388 patent, Figure 3A; 8:20-40). Again contrary to SEMCO's arguments, Huntair's proposed construction of "exhaust air stream" as the "stream of air exhausted from the controlled space" is supported by Figures 3A-3E and the patent specification because all four streams, **20***a***, 20***b***, 20***c***,** and **20***d*, are being exhausted from the controlled space and are called the "exhaust air stream." SEMCO's proposed construction is not supported by the patent specification and is inconsistent with the claim language.

> E. "cooler" (all asserted claims) / "the cooler comprises a cooling coil" (claims 5, 12) / "the cooler has a controlled cooling output, the system further comprising a cooling controller for adjusting the cooling output of the cooler" (claims 18, 28) / "the cooling output of the cooler is adjusted so as to control the level of cooling or dehumidification provided by the cooler" (claims 19, 29) / "controlling the output of the cooler to adjust the level of cooling or dehumidification provided to the supply air stream" (claim 49)

| HUNTAIR'S PROPOSED CLAIM CONSTRUCTION | SEMCO'S PROPOSED CLAIM CONSTRUCTION |
| --- | --- |
| should be construed as used in the patent to mean *a device containing a chilled water* | One of ordinary skill in the art, within the context of the Fischer Patent, would |

8

| HUNTAIR'S PROPOSED CLAIM CONSTRUCTION | SEMCO'S PROPOSED CLAIM CONSTRUCTION |
|---|---|
| *cooling coil or a direct expansion cooling coil for cooling and dehumidifying the supply air stream, and containing a controller for adjusting the amount of cooling and dehumidification provided* | understand the claim term "cooler" to mean "any device that cools and dehumidifies the supply air stream". |

SEMCO's reliance on claim differentiation is again misplaced. As shown above, claim differentiation must be ignored where, as here, the claim language dictates a particular construction. All claims require a cooler that is "adapted" to cool and dehumidify the supply air stream. (Huntair Br. at 17-18). Therefore, the "cooler" in all the claims must include a controller, notwithstanding the reference to a controller in one of the dependent claims. (*See, e.g.*, '388 patent, claims 18-19).

SEMCO's assertion that Huntair has improperly imported a limitation from the specification into the claims is also incorrect. Here, SEMCO proposes a construction that is purely functional, subjecting the claim limitation to 35 U.S.C. § 112, ¶ 6. Therefore, the Court is required to look to the patent specification for corresponding structure and equivalents thereof. The only structure disclosed in the patent specification is a cooler containing a "chilled water cooling coil" or a "direct expansion cooling coil." Therefore, the claimed "cooler" should be limited to such structure disclosed in the patent specification. Limiting the structure pursuant to § 112, ¶ 6 is required and is not tantamount to impermissibly importing a limitation into the claim.

### F. "desiccant" / "desiccant-based" (claims 2, 3, 9, 10, 46, 47)

| HUNTAIR'S PROPOSED CLAIM CONSTRUCTION | SEMCO'S PROPOSED CLAIM CONSTRUCTION |
|---|---|
| "desiccant" should be construed as used in the patent to mean *a substance with the ability to attract and hold relatively large amounts of water* | The term "desiccant" is construed to have its ordinary and customary meaning of "material[] capable of adsorbing or absorbing water from an air stream." |
| "desiccant-based" should be construed as used in the patent to mean *by the use of a substance with the ability to attract and hold relatively large amounts of water* | The term "desiccant-based dehumidification wheel" would be understood by one of ordinary skill in the art in the context of the Fischer Patent to be a "dehumidification wheel" having the same meaning as in Claim 1 [6] that employs desiccant. |

SEMCO faults Huntair's proposed definition of "desiccant" for providing only "a narrow subset description of some desiccants" because the portion of the patent specification cited by Huntair states that desiccants "can be . . . substances that have the ability to attract and hold relatively large quantities of water." ('388 patent, 2:31-32). However, SEMCO does not explain what relevant desiccants are omitted by Huntair's proposed construction. Furthermore, SEMCO's citation to the patent specification in support of its definition also equally implies that it refers only to a subset of desiccants. ('388 patent, 11:9-15 ("Desiccant materials . . . ***may include*** . . . materials capable of adsorbing or absorbing water vapor from an air stream.") (emphasis added)). SEMCO has not shown Huntair's proposed construction to be inappropriate or unsupported by the patent specification.

10

G. **"dehumidification wheel" (all asserted claims)**

| HUNTAIR'S PROPOSED CLAIM CONSTRUCTION | SEMCO'S PROPOSED CLAIM CONSTRUCTION |
|---|---|
| should be construed as used in the patent to mean *a rotating wheel that exchanges heat and moisture between the supply and exhaust air streams* | One of ordinary skill in the art, within the context of the Fischer Patent, would understand the claim term "dehumidification wheel" to mean "a dehumidification wheel that removes latent energy (moisture) from one air stream and transfers this latent energy to another air stream, while also exchanging sensible energy (temperature) between those airstreams". |

SEMCO has not argued a construction for "dehumidification wheel." Therefore, the Court should adopt Huntair's proposed constructions for the reasons argued in Huntair's Opening Claim Construction Brief (Huntair Br. at 14-15).

SEMCO's assertion that Huntair admitted "that the Claim 15 [6] should be construed to have its ordinary and plain meaning" (SEMCO Br. at 22) is incorrect. Huntair has proposed constructions for "dehumidification wheel," "supply air stream," and "exhaust air stream," which are all incorporated into Huntair's proposed construction of Claim 15 [6]. (*See* Huntair Br., Ex. 1 at 5-6, 20-21).

H. **"dry and cool zone" (claims 15, 25, 37, 44-47, 49) / "moist and warm zone" (claims 15, 25, 37, 44-47, 49) / "warm and dry zone" (claims 15, 25, 37, 44-47, 49) / "cool and moist zone" (claims 15, 25)**

| HUNTAIR'S PROPOSED CLAIM CONSTRUCTION | SEMCO'S PROPOSED CLAIM CONSTRUCTION |
|---|---|
| "dry and cool zone" is indefinite. However, in the event the term can be construed, "dry and cool zone" should be construed as used in the patent to have its plain and ordinary meaning, which is *a zone that is dry and cool.* | The term "dry and cool zone" of the total energy recovery wheel would be understood by one of ordinary skill in the art in the context of the Fischer Patent to be "a dry and cool zone of the total energy recovery device." When in the cooling/dehumidification mode (the air conditioning (cooling) mode), the "dry and cool zone" of the total energy recovery wheel |

11

| HUNTAIR'S PROPOSED CLAIM CONSTRUCTION | SEMCO'S PROPOSED CLAIM CONSTRUCTION |
|---|---|
| | would be the portion of the wheel exposed to the supply air stream. |
| "moist and warm zone" is indefinite.<br><br>However, in the event the term can be construed, "moist and warm zone" should be construed as used in the patent to have its plain and ordinary meaning, which is *a zone that is moist and warm.* | The term "moist and warm zone" of the total energy recovery wheel would be understood by one of ordinary skill in the art in the context of the Fischer Patent to be the portion of the wheel exposed to the exhaust air stream when in the cooling/dehumidification mode. |
| "warm and dry zone" is indefinite. However, in the event the term can be construed, "warm and dry zone" should be construed as used in the patent to have its plain and ordinary meaning, which is *a zone that is warm and dry.* | When in the cooling/dehumidification mode (the air conditioning (cooling) mode): the "warm and dry zone" of the dehumidification wheel would be the portion of the wheel exposed to the supply air stream. |
| "cool and moist zone" is indefinite.<br><br>However, in the event the term can be construed, "cool and moist zone" should be construed as used in the patent to have its plain and ordinary meaning, which is *a zone that is cool and moist* | [When in the cooling/dehumidification mode (the air conditioning (cooling) mode):] the "cool and moist zone" [of the dehumidification wheel] would be the portion of the wheel exposed to the exhaust air stream. |

SEMCO argues that "warm and dry zone" and "cool and moist zone" should be given their ordinary and plain meaning. (SEMCO Br. at 22). However, SEMCO has not argued a construction for "dry and cool zone" or "moist and warm zone." All four of these terms are fatally indefinite because they do not provide a standard for measuring the degree of temperature or humidity. Therefore, the Court should hold these terms to be indefinite. In the alternative, the Court should adopt Huntair's proposed constructions for the reasons argued in Huntair's Opening Claim Construction Brief (Huntair Br. at 20-22).

### I. Other terms not argued by SEMCO

#### 1. "air supplier" (claims 1-15, 18-19, 25, 28-29)

| HUNTAIR'S PROPOSED CLAIM CONSTRUCTION | SEMCO'S PROPOSED CLAIM CONSTRUCTION |
|---|---|
| should be construed as used in the patent to mean *a device, such as a fan or blower, for supplying air* | The term "air supplier" would be understood by one of ordinary skill in the art in the context of the Fischer Patent to mean, for example a fan, blower, or other equivalent device for moving the supply air stream. |

SEMCO has not argued a construction for "air supplier." Therefore, the Court should adopt Huntair's proposed construction for the reasons argued in Huntair's Opening Claim Construction Brief (Huntair Br. at 10).

#### 2. "air exhauster" (claims 1-15, 18-19, 25, 28-29)

| HUNTAIR'S PROPOSED CLAIM CONSTRUCTION | SEMCO'S PROPOSED CLAIM CONSTRUCTION |
|---|---|
| should be construed as used in the patent to mean *a device, such as a fan or blower, for exhausting air from the controlled space* | The term "air exhauster" would be understood by one of ordinary skill in the art in the context of the Fischer Patent to mean, for example, a fan, blower, or other equivalent device that exhausts air out of the controlled space. |

SEMCO has not argued a construction for "air exhauster." Therefore, the Court should adopt Huntair's proposed construction for the reasons argued in Huntair's Opening Claim Construction Brief (Huntair Br. at 11-12).

3. "total energy recovery device" (claims 1-15, 18-19, 25, 28-29, 37) / "total energy recovery wheel" (claims 8-15, 18-19, 29, 44-47, 49)

| HUNTAIR'S PROPOSED CLAIM CONSTRUCTION | SEMCO'S PROPOSED CLAIM CONSTRUCTION |
|---|---|
| should be construed as used in the patent to mean *a rotating wheel that exchanges heat and moisture between the supply and exhaust air streams* | The term "total energy recovery device" would be understood by one of ordinary skill in the art to mean "any device that removes sensible energy (temperature) and latent energy (moisture) from one air stream and transfers this sensible and latent energy to another air stream." The term "total energy recovery wheel" shall have the same meaning as "total energy recovery device" in the form of a wheel, as set out in Claim 1 [5]. |

SEMCO has not argued a construction for "total energy recovery device" or "total energy recovery wheel." Therefore, the Court should adopt Huntair's proposed constructions for the reasons argued in Huntair's Opening Claim Construction Brief (Huntair Br. at 13-14).

4. "passive" (claims 4, 11, 45)

| HUNTAIR'S PROPOSED CLAIM CONSTRUCTION | SEMCO'S PROPOSED CLAIM CONSTRUCTION |
|---|---|
| should be construed as used in the patent to mean *desiccant-based where the desiccant does not require any additional high temperature energy to release its held water* | The term "passive dehumidification wheel" would be understood by one of ordinary skill in the art in the context of the Fischer Patent to be "a passive desiccant-based wheel that does not require any additional high temperature regeneration energy in order to regenerate the wheel". |

SEMCO has not argued a construction for "passive." Therefore, the Court should adopt Huntair's proposed construction for the reasons argued in Huntair's Opening Claim Construction Brief (Huntair Br. at 19), and reject SEMCO's unnecessary and confusing use of "regeneration energy" and "to regenerate."

14

### 5. "cooling/dehumidification mode" (claim 18)

| HUNTAIR'S PROPOSED CLAIM CONSTRUCTION | SEMCO'S PROPOSED CLAIM CONSTRUCTION |
|---|---|
| should be construed as used in the patent to mean *mode of operating the system to cool and dehumidify the supply air stream* | The term "cooling/dehumidification mode" would be understood by one of ordinary skill in the art in the context of the Fischer Patent to mean an "air conditioning mode". |

SEMCO has not argued a construction for "cooling/dehumidification mode." Therefore, the Court should adopt Huntair's proposed construction for the reasons argued in Huntair's Opening Claim Construction Brief (Huntair Br. at 20).

## III. CONCLUSION

For the reasons set forth in this brief and Huntair's Opening Claim Construction Brief, Huntair respectfully requests that the Court adopt Huntair's proposed constructions.

Respectfully submitted,

15

Dated:  September 26, 2011         /s/ Alexander G. Piller
Richard T. McCaulley, Jr. (admitted *pro hac vice*)
Alexander G. Piller (admitted *pro hac vice*)
ROPES & GRAY LLP
111 South Wacker Drive, 46th Floor
Chicago, IL  60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
richard.mccaulley@ropesgray.com
alexander.piller@ropesgray.com

Mark M. Iba   MO #45452
Angela G. Nichols   MO #56870
STINSON MORRISON HECKER LLP
1201 Walnut Street, Suite 2900
Kansas City, MO  64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
miba@stinson.com
anichols@stinson.com

*Attorneys for Defendant*
*Huntair, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 26, 2011, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which sent notification of such filing to all parties receiving notice by electronic means.

                                                /s/ *Alexander G. Piller*
                                                         Attorney